In Re: THE EXXON VALDEZ.

Grant Baker, et al., as representatives of the Mandatory Punitive Damages Class, Plaintiffs–Appellees,

v.

Exxon Corporation; Exxon Shipping Company, Defendants–Appellants.

No. 99–35898.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 9, 2000

Filed Feb. 8, 2001

John F. Daum, O'Melveny & Myers, Los Angeles, California, for the defendants-appellants.

Brian B. O'Neill, Faegre & Benson, Minneapolis, Minnesota; David W. Oesting, Davis Wright Tremaine, Anchorage, Alaska, for the plaintiffs-appellees.

Before: BROWNING, SCHROEDER, and KLEINFELD, Circuit Judges.

SCHROEDER, Circuit Judge:

This is another appeal arising out of the verdict and judgment of five billion dollars in punitive damages against Exxon Corporation following the disastrous 1989 Exxon Valdez oil spill into Prince William Sound, Alaska. As in an earlier appeal, we here consider whether some of the plaintiffs who settled with Exxon before certification of the mandatory punitive damages class are entitled to share in the allocation of the punitive damages judgment. *See In re Exxon Valdez (Icicle Seafoods, Inc., et al. v. Baker, et al.)*, 229 F.3d 790 (9th Cir. 2000). As in *Icicle*, we here assume without deciding the validity of the judgment against Exxon, which is challenged in a related appeal. *See id.* at 793.

At issue in this appeal is the district court's July 23, 1999 order granting final approval to the plan of allocation of punitive damages to the seafood processors who were included in the plaintiff punitive damages class. The approved "Processor Plan" excluded several processors who otherwise would have been entitled to share in the punitive damages award. They were excluded because in earlier settlements, they had released their compensatory damages claims and partially assigned their punitive damages claims to Exxon in exchange for large lump sum payments from Exxon. This appeal is prosecuted by Exxon itself as the assignee of four of those excluded processors: Western Alaska Fisheries, Inc., Copper River Fishermen's Cooperative, Seahawk Seafoods, and Kodiak Salmon Packers, Inc. (collectively, the "Four Processors").[1] Exxon seeks to recover pursuant to its assignments and thus to participate in the damages allocation. Appellees are the representatives of the mandatory plaintiff class.

The disputed settlement agreements and partial assignments all occurred years before the 1994 certification of the mandatory punitive damages class. Exxon, however, at the time of the settlements, anticipated that there would be a punitive damages class, and understood that a conventional settlement of punitive damages, accompanied by the usual total release of claims by settling plaintiffs, would not work to Exxon's advantage in this case. This is because the release of individual claims for punitive damages would not affect the jury's eventual lump sum determination of the total punitive damages to be awarded to the class. As we explained in *Icicle*, Exxon "actually faced a financial disincentive to settle, because any amount of money [Exxon] paid to persuade an individual plaintiff to [give up its claim to punitive damages] would nevertheless be included in the amount of the eventual award." *See* 229 F.3d at 793.

Faced with this dilemma, Exxon tried to ensure that it would eventually recoup at least a portion of the actual share of punitive damages represented by the settled claims, thereby reducing Exxon's total punitive damages exposure. To this end, Exxon incorporated a device in its settlement agreements with the Four Processors that was functionally similar to the device it would later use in settling with the *Icicle* plaintiffs. In *Icicle*, the device utilized was a "cede back" agreement. There, the settling plaintiffs agreed to pursue their claims for punitive damages on their own behalf and, pursuant to their settlement agreements, "cede" a portion back to Exxon. *See Icicle*, 229 F.3d at 793. In the settlements we consider in this appeal, Exxon utilized partial assignments to accomplish the same result. Under these agreements, the Four Processors assigned to Exxon all but a small

---

1. In its reply brief, Exxon abandoned its claims pertaining to assignments from Drag-
net Fisheries, Inc. and Inlet Fisheries, Inc.

portion of their future individual claims to punitive damages so that Exxon could pursue the assigned portion in its own name and for its own benefit.

Following the jury's 1994 punitive damages verdict, the major remaining problem in the litigation was allocation of damages among individual plaintiffs. In 1996, the representatives of the class plaintiffs moved for and obtained approval of a global plan of allocation, which provided for set percentage amounts of the total award to be allocated to specific categories of claimants. The global plan earmarked to the seafood processors 2.1% of the total five billion dollar award.

Following approval of the global plan, plaintiffs' class representatives set about crafting a separate allocation plan for each of the fifty-one claim categories. Each plan prescribed how the percentage of judgment allocated to each category would be distributed among individual claimants. In May 1997, plaintiffs moved for approval of their proposed Processor Plan, which they described as "the product of collaboration and negotiation." That plan excluded the portions of the claims of the Four Processors that had been assigned to Exxon, and refused to recognize the validity of those assignments.

Exxon objected, seeking enforcement of the assignments and a share of the distributions under the Processor Plan. The district court overruled Exxon's objections and approved the plan, relying upon the same reasoning that it had used in rejecting the claims that we considered in *Icicle:* namely, that Exxon should be prevented from sharing in the punitive damages. *See id.* at 793–98.

In this appeal by Exxon, we consider three issues. The first is whether Exxon lacks standing to appeal because it never formally intervened as a plaintiff in the allocation proceedings. We hold that it has standing. The second is whether, as a matter of public policy, the district court correctly ruled that Exxon should not be able to share in the punitive damages. That issue is controlled by our decision in

*Icicle* in which we held that public policy supports functionally similar settlement agreements in situations like this, where an agreement on the part of the plaintiff to permit the defendant to share in the plaintiffs' punitive damages is necessary to permit any meaningful settlement of the punitive damage claims. *See id.* at 798. The third issue is therefore whether there is any material difference between this case and *Icicle,* since in this case Exxon relies on an assignment rather than a "cede back" agreement. We hold there is no material difference and therefore vacate the district court's order.

■ We turn first to appellees' contention that Exxon lacks standing to appeal. Appellees claim that Exxon was required to intervene formally in the district court proceedings as a party plaintiff in order to maintain any right to rely upon its assignments from the Four Processors and to recover damages. This argument is formalistic in the extreme, and lacks substance. Exxon has been a party to this case from the beginning and now contends that it is aggrieved by the district court's order denying the validity of its assignments.

■ Appellees point out that Exxon was originally a defendant and is now shifting sides. They contend that Exxon therefore should have formally applied to intervene as a claimant, even though it was already a party defendant. We view Exxon's shift from defendant to claimant as analogous to a realignment of parties within ongoing litigation. *See, e.g. Keith v. Volpe,* 858 F.2d 467, 476 (9th Cir.1988). As in cases where diversity of citizenship is at issue, it is the court's responsibility to align the parties according to their interests in the litigation. *See id.; Dolch v. United California Bank,* 702 F.2d 178, 181 (9th Cir. 1983). Exxon's interests in recovering pursuant to its assignments clearly align it with other punitive damages claimants to the extent of the assignments.

Appellees rely on *Marino v. Ortiz*, where the Supreme Court held that persons who were not parties to the underlying lawsuit, nor members of either the certified classes or the various associations and societies who formally intervened as co-defendants, had no standing to challenge a consent decree approving a settlement agreement. *See* 484 U.S. 301, 303–04, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (per curiam). *Marino*'s denial of standing depended upon the challengers' status as non-parties. In this case, Exxon is already a party, and falls within the general rule that only parties "or those that properly become parties may appeal an adverse judgment." *See id.* at 304, 108 S.Ct. 586. There was therefore no reason for Exxon to file a formal motion to intervene. Appellees cite no authority suggesting a contrary result.

■ The merits of this controversy concern whether Exxon may enter into a settlement agreement that permits it to recoup damages assessed against itself. This issue is controlled by our decision in *Icicle*, where we held that policies supporting settlement of disputes militate in favor of permitting such settlements. *See* 229 F.3d at 798 ("Far from being unethical, cede back agreements make it easier to administer mandatory class actions for the assessment of punitive damages and encourage settlement in mass tort cases."). Hence, the district court erred here, as in *Icicle*, in refusing to permit Exxon to share in the punitive damages award.

The final issue is whether this case should be treated any differently because Exxon received an "assignment" rather than an agreement to "cede back." Exxon is here pursuing the claims in its own name, rather than indirectly through the settling plaintiffs as was the case in *Icicle*. Appellees maintain that an assignment is different from a cede back agreement because in form, an assignment grants Exxon a claim to collect on a judgment against itself and thereby creates a legal impossibility that extinguishes the plaintiffs' claims. In support, appellees rely on language in two cases: *Matter of Lockard*, 884 F.2d 1171, 1178 n. 13 (9th Cir.1989) ("He cannot, after all, have a claim against himself."), and *Bartneck v. Dunkin*, 1 Cal. App.3d 58, 62, 81 Cal.Rptr. 428, 431 (Cal. App.1969) ("The assignment of the claim to some of the defendants is ample evidence that there was an intent to release those defendants from any further liability.").

Appellees' arguments ignore the mandatory class action context of the settlements in this case. The settlements could not have affected the Four Processors' membership in the plaintiff class because membership was mandatory. The assignments therefore did not affect Exxon's duty to pay the entire five billion dollars into a damages fund. Rather than asserting the merits of any claim of its own, Exxon is now pursuing the Four Processors' claims in order to reduce its out of pocket, lump sum liability to the class as a whole. *See Misic v. Building Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1378 (9th Cir.1986) (per curiam) ("[A] valid assignment confers upon the assignee standing to sue in place of the assignor."); *see also United States v. Thornburg*, 82 F.3d 886, 891 (9th Cir.1996) (recognizing common law rule that an assignee stands in the shoes of the assignor). Appellees' proffered distinctions between the partial assignments in this case and the cede back agreements in *Icicle* are distinctions without a material difference. Both devices performed the identical function, accomplished the same result, and encouraged settlements in this mass tort litigation. *See Icicle*, at 797–98 (holding that the cede back agreements achieved the functional equivalent of a proportionate share allocation of damages, and "blend[ed] fairness to the parties with incentives to settle"). Exxon has no more of a conflict of interest in enforcing the assignments in this case than it had in recovering damages through the cede back agreements in *Icicle*.

The district court's final order approving the Processor Plan is VACATED and the

matter REMANDED for enforcement of the settlement agreements.